IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Justin Jones, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 3:15-4236-JMC-KDW |
| | ) | |
| v. | ) | REPORT and RECOMMENDATION |
| | ) | |
| Eaton Corporation, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter is before the court pursuant to 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2) (D.S.C.) for a Report and Recommendation ("Report") on the Motion for Summary Judgment filed by Defendant Eaton Corporation ("Defendant" or "Eaton"), ECF No. 36, in which Eaton seeks judgment as a matter of law as to all causes of action. Plaintiff Justin Jones ("Plaintiff" or "Jones") has sued Eaton, his former employer, pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq*., alleging retaliation and sexual harassment based on a hostile work environment. Compl., ECF No. 1-1.

Having considered Defendant's Motion; Plaintiff's Response, ECF No. 40; and Defendant's Reply, ECF No. 44, the undersigned recommends Defendant Eaton's Motion for Summary Judgment, ECF No. 36, be *granted*.

I.    Standard of Review

    A.    Motions for summary judgment

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23

(1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In considering a motion for summary judgment, the evidence of the nonmoving party is to be believed and all justifiable inferences must be drawn in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248. All that is required is that "sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 249. "Mere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995). A party cannot create a genuine issue of material fact solely with conclusions in his or her own affidavit or deposition that are not based on personal knowledge. *See Latif v. The Cmty. Coll. of Baltimore*, 354 F. App'x 828, 830 (4th Cir. 2009) (affirming district court's grant of summary judgment, noting plaintiff's affidavit, which offered conclusions not based on his own knowledge, did not create genuine issues of material fact). In discrimination cases, a party is entitled to summary judgment if no reasonable jury could rule in the nonmoving party's favor. *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002) (Title VII). The court cannot make credibility determinations or weigh the evidence, but the court should examine uncontradicted and unimpeached evidence offered by the moving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The court must determine whether a party's offered evidence is legally sufficient to support a finding of discrimination and look at the strength of a party's case on its own terms. *See id.* at 148 (stating that "[c]ertainly there will be

instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational fact-finder could conclude that the action was discriminatory").

       B.      Burden of proof in Title VII claims

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e–2(a)(1). A plaintiff may demonstrate a violation of Title VII through direct or circumstantial evidence. When direct evidence is lacking, a plaintiff may produce circumstantial evidence and proceed under the *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Here, Plaintiff does not argue he has presented any direct evidence of discrimination, so the court considers his claims under the burden-shifting framework. Pursuant to this framework, once the plaintiff establishes a prima facie case of a violation of Title VII, the burden shifts to the defendant to produce evidence of a legitimate, nondiscriminatory reason for its employment action. *Merritt v. Old Dominion Freight*, 601 F.3d 289, 294 (4th Cir. 2010). If the defendant meets the burden to demonstrate a legitimate, nondiscriminatory reason for its employment action, the burden shifts back to the plaintiff to demonstrate by a preponderance of the evidence that the proffered reason was "not its true reason[ ], but [was] a pretext." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

For status-based discrimination claims, such as harassment or discrimination claims based on gender or race, the employee must "show that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2523 (2013). Retaliation claims, by contrast, require the employee to show "that retaliation was a but-for cause of a challenged adverse employment action." *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 252 (4th Cir. 2015); *see Nassar*,

133 S. Ct. at 2533 ("Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in § 2000e–2(m). This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.").[1]

While intermediate evidentiary burdens shift back and forth, the ultimate burden of persuasion that the defendant engaged in intentional discrimination remains at all times with the plaintiff. *See Reeves,* 530 U.S. at 146–47 ("The ultimate question is whether the employer intentionally discriminated, and proof that 'the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason . . . is correct.'") (quoting *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506 (1993)).

II.    Facts

To the extent supported by the record and germane to this Motion, the court considers the facts in the light most favorable to Plaintiff, the nonmoving party, and potentially differing accounts of relevant events are noted. As an initial note, some of the background facts are derived from Defendant's Motion and were not addressed by Plaintiff. Further, some of the information Plaintiff included in his Statement of Facts is better addressed in the context of arguments below.

A.    Evidence proffered by Plaintiff

Plaintiff claims he was harassed sexually by his former direct supervisor, Kelvin McGraw ("McGraw"). Plaintiff's support for his factual recitation comes largely from a 13-page, single-spaced typed, unsigned document labeled as "Exhibit 4, Harassment Complaint." ECF No. 40-4 [hereinafter

---

[1] Unlike Title VII status-based claims, the adverse action in the retaliation context must be a "materially adverse action," which is "explicitly less restrictive" than the "adverse employment action" requirement in discrimination cases. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006). Courts sometimes use these terms interchangeably. *See Hinton v. Va. Union Univ.*, 185 F. Supp. 3d 807, 828 (E.D. Va. 2016) (noting a "significant subset of Fourth Circuit cases continued reciting 'adverse employment action' as an element of Title VIII retaliation claims"). Here, in Plaintiff's retaliation claim, he must show he suffered materially adverse action(s) as part of his prima facie case.

"Plaintiff's Statement"]. Plaintiff indicates he provided this Statement to Detra Mardis, the Human Resources ("HR") Manager for Defendant's Sumter, South Carolina facility, on December 16, 2013, when reporting allegations of sexual harassment regarding his then-supervisor. Pl. Mem. 7 (referencing ECF No. 40-4 and Mardis Aff. ¶ 4, ECF No. 36-3). The undersigned notes, however, that some of the information contained in Plaintiff's Statement post-dates December 2013.[2] Defendant has not objected to Plaintiff's use of the Statement, nor does it question the Statement's authenticity. Accordingly, the court looks to it as appropriate; it does not consider the portions of the submissions that would be inadmissible or that are not made on personal knowledge.

Plaintiff also proffers the affidavit of Ricky Jerome Parrott, an Eaton employee who was Plaintiff's co-worker for about three years. Parrott Aff., ECF No. 40-2. As noted by Defendant, portions of Parrott's affidavit lack foundation and are based on speculation. *See White v. Boyle*, 538 F.2d 1077, 1079 (4th Cir. 1976) (noting party resisting summary judgment must present some evidence to indicate facts are in dispute; bare contentions to that effect are not sufficient). In addition, portions of Plaintiff's Statement and Parrott's Affidavit contain potentially inadmissible, speculative conclusory statements or evidence concerning, *inter alia*, the causal relationship between events. A party cannot create a genuine issue of material fact solely with conclusions in his or her own affidavit or deposition that are not based on personal knowledge. *See Latif v. The Cmty. Coll. of Baltimore*, 354 F. App'x 828, 830 (4th Cir. 2009) (affirming grant of summary judgment, noting plaintiff's affidavit, which offered conclusions not based on his own knowledge, did not create genuine issues of material fact). However, non-speculative portions of Plaintiff's Statement and Parrott's Affidavit that relay first-hand knowledge may be considered herein. The undersigned has reviewed the entire content of Plaintiff's Statement and Parrott's Affidavit. *See* Pl. Stmt. ECF No. 40-4; Parrott Aff., ECF No. 40-2.

---

[2] Plaintiff's Statement is not an affidavit, nor is it signed by Plaintiff. *Williams v. N. Charleston Police Dep't*, No. 2:13-CV-02969-RMG, 2014 WL 4273317, at *4–5 (D.S.C. Aug. 29, 2014) (noting "an unsworn affidavit is incompetent to raise a fact issue precluding summary judgment"); *cf.* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.").

Finally, Plaintiff has provided 49 pages of printed text messages between Plaintiff and McGraw, his former supervisor at Eaton and his alleged harasser. Text Messages, ECF No. 40-1 (filed under seal). In its response to Plaintiff's Motion to Seal those texts, Defendant argued the entire exhibit was unnecessary as the message copies were not relevant to the issues presented in summary judgment. In the event the messages remained in the record, though, Defendant agreed they should be filed under seal. In addition, if Plaintiff's set of text messages was filed, Defendant asked that a separate, larger document-set of the text messages be filed under seal. ECF No. 46-1. In a separate order, the undersigned granted the Motion to Seal both sets of text messages. Order, ECF No. 54. In ruling on the Motion to Seal, the undersigned declined to make detailed evidentiary-based determinations as to the text messages. Here, neither party has questioned the foundation or authenticity of these text messages. The court may reference and consider the messages as appropriate.

B.     Plaintiff's employment at Eaton

Plaintiff began his employment with Defendant as an intern in June 2011. After he completed an internship, Defendant hired Plaintiff in a full-time position as a switchboard technician at its Sumter, South Carolina facility on May 7, 2012. Pl. Dep. 60, ECF No. 36-2. Plaintiff reported directly to Kelvin McGraw, Technical Services Manager, who supervised all switchboard technicians. *Id.* at 152; Mardis Aff. ¶ 3.

1.     Defendant's "Harassment-Free-Workplace" Policy

At the time of his hire, Plaintiff received the Eaton Employee Guidebook, and he was aware that it contained policies, which, among other things, prohibited workplace harassment. Pl. Dep. 66–67. Plaintiff also knew how to access Defendant's policies online. *Id.* at 66. Plaintiff noted in deposition that he referred to the Guidebook, including the Harassment Free Workplace Policy ("HFW Policy") during his employment. *Id.* Plaintiff noted he consulted the Guidebook and the HFW Policy "[w]hen he started getting harassed." *Id.*

6

Defendant's HFW Policy provides in part:

> Eaton supports the right of all employees and visitors to work in a productive, professional environment and, therefore, will not tolerate any form of harassment in its workplace. Harassment directed toward any employee, customer, vendor, or other visitor is strictly prohibited.

Mardis Aff. ¶ 5 & attach. 2 thereto, ECF No. 36-3 at 7. The HFW Policy provides examples of prohibited conduct, including "[a]ctions, promises or threats regarding any term or condition of employment conditioned upon providing, or failing to provide, sexual favors[;] [u]nwelcome sexual advances or physical contact that is offensive, intimidating, or threatening"; and "[i]deas, pictures, objects, or expressions that are demonstrated which are disrespectful of others and/or conflict with the company's goal of maintaining an environment that is free of harassment." *Id.*[3] The HFW Policy sets out a three-step Complaint Procedure for any "employee or visitor who believes that he or she is being harassed, or who observes harassing behavior." *Id.* Defendant's HFW Policy assures that individuals who complain of harassment or participate in investigating harassment allegations will be protected from retaliation. *Id.*, ECF No. 36-3 at 8.

2.     Plaintiff's job performance before reporting McGraw[4]

As a switchboard technician, Plaintiff's primary responsibility was to "[a]ccurately interpret customer supplied drawings, specifications, and notes [for electrical switchboards] and translate them into drawings and bills-of-material for internal customers in Manufacturing and Purchasing, as well as external customers." Pl. Dep. 68–30; Job Description, ECF No. 36-2 at 68. Plaintiff acknowledged in deposition that he was required to do all that was entailed in the job description. He also stated that McGraw had advised Plaintiff he would be able to work his way up to performing the "3D technician switchboard part" of the job. Pl. Dep. 70. Plaintiff stated that he was told he would need to be able to

---

[3] This is not a full list of the examples listed in the HRW Policy. Defendant's full HRW Policy may be reviewed at ECF No. 36-3 at 7-8.

[4] Plaintiff characterizes his work performance for the period before reporting McGraw as "positive," citing only his Complaint. *See* Pl. Mem. 18. Assessments of Plaintiff's work performance offered by Plaintiff and by his non-supervising coworker Parrott are discussed below.

understand and perform the switchboard-technician position in order to do 3D drawing. Pl. Dep. 76. At one point [no date or timeframe indicated] McGraw "switched over" and advised Plaintiff he could not do the 3D but advised Plaintiff he "need[ed] to be the tech." *Id.* Plaintiff acknowledged that he and all switchboard technicians were held to certain quantity and quality standards. *Id.* at 75–77.

In April 2013, McGraw completed an annual performance evaluation for Plaintiff, giving him an overall rating of "P3," which meant he was performing at an average level.[5] The evaluation covered the period from May 2012, when Plaintiff began his full-time position, through the end of December 2012. Pl. Dep. 83–84; Apr. 9, 2013 Performance Evaluation Form (for evaluation period of May to December 2012), ECF No. 36-2 at 69–70. In the "Manager Comments" sections, McGraw indicated as follows:

> Justin is becoming a very valuable member of the team. He has displayed leadership skills with owning the daily production schedule. Justin needs to be more proactive when it comes to designing new parts. Since he has been on board, Justin has learned to process FDS/MF orders in addition to the skills needed to create special parts for the CMSC organization. As discussed during several coaching sessions, Justin needs to focus on his productivity and his designing skills. Justin has the potential to become the go-to person for MI generation.
>
> * * *
>
> Justin has demonstrated flexibility to meet the MI generation needs by learning MF/FDS and the satellite tech role. He is the point person for the schedule. Going forward he needs to focus on the finish work and productivity. This will [be] key in 2013. I am glad to have Justin on our team.

Apr. 2013 Performance Evaluation, ECF No. 36-2 at 69–70.[6]

---

[5] The Performance Evaluation Form allows for rating an employee in two key areas—Accomplishments and Competencies. The ratings categories for Accomplishments are: Outstanding; Highly Effective; Performing; Needs Improvement; and Unsatisfactory. The Competencies categories are: High Demonstration/Role Model, 5; Very Proficient, 4; Fully Demonstrating, 3; Inconsistent Demonstration, 2; and Not Demonstrating, 1. In the April 2013 Evaluation, McGraw rated Plaintiff's Accomplishments as "Performing," and in the Competencies area Plaintiff scored "Fully Demonstrating, 3," in five categories and "Inconsistent Demonstration, 2" in one category. April 2013 Performance Evaluation Form, ECF No. 36-2 at 69-70.

[6] While the undersigned is unsure what the acronyms "FDS/MF," "CMSC," and "MI" mean, such knowledge is not necessary.

In a separate typed document setting Plaintiff's 2013 goals, handwritten goals were added, reminding Plaintiff to "bring up productivity" and "reduce # of turnbacks [mistakes or quality deficiencies]." Apex-Mfg. Justin Jones 2013 Goals, ECF No. 36-2 at 71. Plaintiff signed this document. *Id*.; Pl. Dep. 91–92.

On July 29, 2013, McGraw noted in Defendant's Oracle system[7] that he discussed Plaintiff's low productivity with him. The entry provided as follows:

> Discussed the quality of his work and his productivity. Currently he has the lowest productivity and one of the highest turnback rates in the group of MI generation technician[s]; Expressed the importance of staying off the phone during work hours. It appears Justin utilizes text messages a lot during work hours and has a lot of non work related traffic in cubicle. Schedule to check his productivity weekly.

ECF No. 36-3 at 5.

Defendant's Front End and Supply Chain Manager at the Sumter facility, Steven Catoe, was McGraw's direct supervisor until McGraw's December 18, 2013 termination. Catoe Aff. ¶ 3, ECF No. 36-4. Catoe was "generally aware" of Plaintiff's performance in 2013. *Id.* In January 2013, Catoe advised McGraw to counsel Plaintiff for failing to include certain information in his drawings. *See* Jan. 3, 2013 email from Catoe to McGraw, ECF No. 36-4 at 5. In August 2013, Catoe advised McGraw that he needed to address Plaintiff's issues with "completing the tasks for teching." ECF No. 36-4 at 9. A report from the third quarter of 2013 reveals that Plaintiff had the highest rate of errors of all then switchboard technicians. Catoe Aff. ¶ 3; Report, ECF No. 36-4 at 11.

C.    Plaintiff's harassment by McGraw, Plaintiff's complaint to HR, and Defendant's response

1.    Harassment

For purposes of this Motion, Defendant has conceded that a hostile work environment existed for Plaintiff when working for McGraw. *See* Def. Mem. 11. Accordingly, a detailed review of

---

[7] Managers such as McGraw would record notes regarding employees' performance into Defendant's Oracle system. Mardis Aff. ¶ 3. Mardis attaches a printout of McGraw's Oracle notations concerning Plaintiff to her affidavit. *Id.*; Oracle transactions for Pl from Jan. 1, 2012 through Aug. 11, 2014, ECF No. 36-3 at 5.

Plaintiff's allegations of harassment is not needed for purposes of ruling on Defendant's Motion for Summary Judgment. That stated, the undersigned provides a brief synopsis of Plaintiff's allegations concerning McGraw's actions, principally taken from Plaintiff's Statement, ECF No. 40-4. Plaintiff's Statement is undated, but the first several pages of it seem to have been written around or just before his December 16, 2013 reporting of McGraw to McGraw's supervisor and to HR. In the Statement, Plaintiff recounts behaviors he described as "harassment, sexual harassment, and unethical behavior," that lasted for "the past two years." Pl. Stmt. 1.

Plaintiff characterizes his initial relationship with his supervisor, McGraw, as one of a mentor-mentee, noting McGraw had periodically loaned money to Plaintiff and made Plaintiff a part of a "mentoring program." Pl. Stmt. 1. Plaintiff was given access to a "Mentor" bank account that had been funded by McGraw. Plaintiff was permitted to make small withdrawals that were loans to be repaid on the following payday. *Id.* Although Plaintiff could not pinpoint a precise time, he testified that McGraw began to harass him at some point while Plaintiff was still an intern. Pl. Dep. 98. Plaintiff gave McGraw the title to his old automobile as collateral for the loans. Pl. Stmt. 1.

McGraw continued to assist Plaintiff, loaning him money to have a car painted, buying a plane ticket for Plaintiff to attend a bachelor party, and helping Plaintiff rent an apartment. Pl. Stmt. 1–2. Plaintiff recalled having been invited to a party at McGraw's home in 2011; McGraw had asked Plaintiff to keep it "hush-hush" because others from the office group had not been invited. It was after this party that McGraw asked Plaintiff about sending nude pictures of himself to McGraw, ostensibly to provide to a woman from the party. Pl. Stmt. 2. Plaintiff eventually sent a chest-only picture for which Plaintiff was paid $300.00. *Id.* Plaintiff also indicated that McGraw attempted to have the two of them be friends outside of work and that McGraw sent an excessive number of text messages to Plaintiff, many including social invitations.

In December 2011, Plaintiff indicates McGraw began texting Plaintiff sexually explicit photographs, the first being a photograph of a man. Pl. Stmt. 2. McGraw also sent at least one explicit

photograph of himself with a woman and numerous explicit photographs of women. *Id.* Plaintiff indicated that if he did not reply to the texts McGraw "would act very resentful towards [him]" and make snide comments. *Id.*

McGraw later began requesting photographs and videos of Plaintiff engaging in sex with women. Pl. Stmt. 3. Plaintiff indicated McGraw became very angry when Plaintiff would not comply, and, at times, Plaintiff sent McGraw photographs he had copied from the internet. *Id.* McGraw asked Plaintiff how much it would cost to obtain a video of Plaintiff engaging in sex; McGraw also asked Plaintiff for photographs of Plaintiff and a female Eaton intern engaging in sex. *Id.*

Plaintiff states McGraw encouraged Plaintiff to apply for a full-time switchboard tech position in early 2012. Pl. Stmt. 3. Plaintiff indicated the tech position was not one he wanted in the long-term because his goal was to have a job engaging in 3-D drawing. McGraw advised Plaintiff that, if Plaintiff took the switchboard tech position, McGraw would ensure Plaintiff moved into a drawing position. *Id.* Plaintiff was hired as a full-time Switchboard Technician on May 7, 2012. Plaintiff indicates McGraw began working on the plan of moving Plaintiff into a 3-D drawing position.[8] McGraw moved Plaintiff to an area where engineers who did 3-D drawing were located to allow Plaintiff to begin training. *Id.*

In October 2012, the "final straw and most disturbing act" took place between Plaintiff and McGraw. Pl. Stmt. 4. McGraw hacked into Plaintiff's mobile telephone and sent threatening text messages to a woman Plaintiff had met in a bar. The messages sent by McGraw purported to be from Plaintiff's girlfriend. *Id.* When Plaintiff confronted McGraw, he admitted to having hacked into the phone and having sent the emails, but he apologized and "begged [Plaintiff] not to take this to human resources." *Id.* Plaintiff "knew" if he went to HR it could be devastating for McGraw's career, so he "decided not to press the issue but to sever any sort of personal relationship with [McGraw]." *Id.*

_____

[8] Catoe indicates that Defendant does not have a position that only involves 3-D drawing, and the work that did exist in that area was the purview of the Senior Switchboard Technician position, for which Plaintiff was neither eligible nor qualified. Catoe Aff. ¶ 7; Pl. Dep. 181.

Plaintiff indicated things became "strained" between him and McGraw. Pl. Stmt. 4. Plaintiff "continued to work and do the best job [he] could." *Id.* He felt he was being closely watched and that McGraw was "complaining and finding issues with [Plaintiff's] work performance that never existed before." *Id.* McGraw's plan to allow Plaintiff to draw in 3-D was "suddenly taken away" and would not happen unless Plaintiff "was the sort of friend [McGraw] wanted [Plaintiff] to be." *Id.* at 4–5. Plaintiff indicated McGraw began finding fault with "everything" Plaintiff did. *Id.* at 5.

        2.      Plaintiff's reporting of McGraw

On December 16, 2013, Plaintiff reported to McGraw's superior, Catoe, that McGraw had been sending Plaintiff text messages that were sexual in content and engaging in other inappropriate conduct. Pl. Dep. 98–99.

Just prior to reporting the harassment to Catoe and Mardis, Plaintiff went to see McGraw and handed him a copy of the packet he was taking to Catoe. Plaintiff relays the following about that conversation:

> Also, when Plaintiff decided to report McGraw's acts of sexual harassment, Plaintiff made three copies of the document that he had typed up. Plaintiff first went to McGraw's office and handed him one of the copies. McGraw read about the first paragraph and threw the document on his desk and said, "what the hell is this? I'm not reading this shit!" Plaintiff proceeded to explain to him that he intended to turn the other two copies into management. McGraw's reaction made Plaintiff fear impending physical violence. McGraw then told Plaintiff that if turned them in he would sue Plaintiff. McGraw then said that if Eaton fired him he would make sure that McGraw[9] got fired as well. He continued to threaten Plaintiff and said that he has a lot of connections and a lot of people that owe him 'favors' and Plaintiff would not last long before he would be fired by Eaton.

Pl. Answer to Interrog. No. 5, ECF No. 40-3[10]; *see also* Pl. Dep. 183–84 (recalling that McGraw told Plaintiff if McGraw was fired based on Plaintiff's reporting that McGraw would "make sure [Plaintiff got] fired as well because he has too many people in here that knows – that owes him favors."); *id.* at 209 (same).

---

[9] So in original. Probably intended to be "Plaintiff."

[10] Federal Rule of Civil Procedure 56(c)(1)(A) includes interrogatory answers as a portion of the record that may be used to support factual positions in a summary judgment motion.

Plaintiff then provided Catoe with a packet of text messages[11] as well as a detailed written summary of the allegedly harassing conduct. Plaintiff testified that he went to Catoe's office to talk with him and handed him the written summary and other documents. Pl. Dep. 144. Catoe did not review the documents immediately, and told Plaintiff he would read them when he had a chance. *Id.* at 144–45. A few minutes later, Catoe called Plaintiff back into his office to meet with him and with HR representative Mardis. Pl. Dep. 98, Mardis Aff. ¶ 4; Pl. Mem. 7.[12]

This was the only time Plaintiff complained to Defendant about McGraw's conduct toward him. Pl. Dep. 100.

### 3. Defendant's response

Defendant reviewed all of the information Plaintiff provided and interviewed McGraw about the information. Mardis Aff. ¶ 4. Two days after Plaintiff's complaint, on December 18, 2013, Defendant discharged McGraw for violation of company policy. Pl. Dep. 148; Mardis Aff. ¶ 4. Plaintiff testified that, after he made the complaint about McGraw, he did not "experience any sexual harassment" from McGraw or from anyone. Pl. Dep. 151.[13]

---

[11] The text messages Plaintiff provided on December 16, 2013 bear the bates stamp numbers of Eaton000056–000144. *See* Def. Resp. Mot. Seal 3, and ex. 1, ECF Nos. 46, 46-1.

[12] Neither party has made it clear whether the actual written document provided to Catoe and Mardis on December 16, 2013 is contained in the record. It appears that the unsigned, unsworn statement of Plaintiff attached as exhibit 4 to his memorandum may be the document that was provided, as the introductory sentence is the same as the sentence referenced in Plaintiff's memorandum. *See* Pl. Mem. 7. Plaintiff indicates he provided Defendant with a 13-page complaint that day. *Id.* Plaintiff's Statement is 13 pages long. ECF No. 40-4. However, Plaintiff's Statement includes information and allegations concerning events that took place well after December 16, 2013. It is possible that the remainder of Plaintiff's Statement was prepared by him after his termination. *See* Pl. Dep. 215. It is probable that Plaintiff gave Defendant only the first five pages of that statement on December 16, 2013. Counsel are reminded of their duty to provide details of record evidence. The court should not be required to deduce what document was given to whom and when.

[13] In responding to Defendant's Motion, Plaintiff argues McGraw continued to "harass" Plaintiff after McGraw had been terminated, stating McGraw had stolen funds from Plaintiff's bank account using personal information McGraw would have accessed while still working for Defendant. Pl. Mem. 7-8. Plaintiff indicates he advised Defendant of this and was told Defendant could not do anything about it because McGraw no longer worked for Defendant. *Id.*, *see also* "Supplemental Information" provided to EEOC on Dec. 11, 2014, ECF No. 40-5.

Plaintiff received a letter from Mardis dated December 19, 2013, advising him that a thorough internal investigation had been conducted and a resolution implemented.  Dec. 19, 2013 Ltr., ECF No. 40-7 at 2. In the letter, Defendant reminds Plaintiff of his obligation to immediately report issues that he believes could conflict with Defendant's Code of Ethics. *Id.*[14]

D.      Plaintiff's post-McGraw job performance[15]

Until McGraw's former position was filled in May 2014, Catoe was Plaintiff's direct supervisor. Pl. Dep. 152–54. In a March 2014 evaluation, Catoe rated Plaintiff's performance with an overall rating of "N3," or Needs Improvement. Pl. Dep. 156; March 2014 Performance Evaluation, ECF No. 36-2 at 72–74. Catoe provided detailed substantive feedback and constructive criticism to Jones:

> Justin has been willing to work on the more complex type switchboards that are in the schedule. This can be helpful and harmful depending on one's skill level. In his case, while he gets exposure to the more complicated orders, he also has the opportunity to make mistakes/errors. He has expressed a desire to do something different within the team[,] but we have been hesitant due largely to the inconsistency of his output/error rates, scrap generation and issues he has to deal with. He relies upon the more senior technicians to assist him in processing orders to ensure minimal errors are created and to learn. Although he responds quickly to issues presented from the assembly lines[,] there is an overwhelming concern that he [does not] truly grasp[] the overall responsibility of the job. He consistently has quality related issues and doesn't appear to learn from past mistakes. Here are the area/items that must be improved upon as we go forward in 2014:
> · Tech OTP [on-time performance]– achieve 90% or greater OTP to drawing due date
> · Productivity – goal = produce 1 section per hour rates at a minimum – averaged .54 sect/hr
> · Quality – reduce/eliminate BOM [bill of material] errors, scrap generation and turnbacks
> · Customer Service – work with sense of urgency when dealing with assembly issues

---

[14] No issue of fact exists as to the letter itself. Defendant's disagreement with Plaintiff's characterization the December 19, 2013 letter as a "reprimand," *compare* Pl. Mem. 8, 19 *with* Def. Reply 8-9, is discussed within.

[15] As discussed within, Plaintiff generally argues his negative reviews in 2014 were untrue and retaliatory.

Mar. 2014 Eval. 2 ("Manager Comments"); *see* Catoe Aff. ¶¶ 4–5 (explaining acronyms). Catoe also

listed several "Strengths" and "Opportunities for Improvement":

> Strengths (Manager Comments):
> · Not afraid to use available resources
> · Willingness to support team—commitment to overtime when required
> · Opportunity for Improvement (Manager Comments):
> · Improve Technician OTP to drawing due date
> · Improve productivity—increase output as compared to hours worked
> · Continued focus when addressing production related issues; respond with a sense of urgency
> · Spend time on the floor learning more about the product to increase knowledge and reduce quality related issues—BOM issues, scrap and turnbacks
> · Ensure job processes are complete when signing item off.

*Id.* at 2. Plaintiff's evaluation included the following "Training/Development Plan":

> · Work with Supervisors in Switchboard to setup training opportunities within assembly to increase your product knowledge and raise your performance standards by reducing quality related issues.
> · Ensure job processes are completed when signing them off—meaning tickets are available for release—closing the loop on the technician process.

*Id.*[16]

The record includes an email chain from March 23–24, 2014 concerning a nonconformance

that had been Plaintiff's mistake and had resulted in $5000 of scrap. Email, ECF No. 36-2 at 77–78. In

Plaintiff's email he acknowledged his mistake and indicated, "I will focus more on the task at hand!"

*Id.* at 77. On March 26, 2014, Plaintiff received another email from Catoe that concerned an issue with

drawings. ECF No. 36-2 at 79–80 ("Justin—this is just another example of you not closing the loop

when processing orders…… please address so we can eliminate these emails……thanks!!")

(punctuation in original). Catoe indicated in his affidavit that he had "noticed a pattern where Jones

would take days to respond to internal customers to finalize and correct problems, when he should

have responded immediately by going to the assembly floor." Catoe Aff. ¶ 6.

---

[16] Plaintiff does not agree with portions of his evaluations, but he does not deny these evaluations or events. Plaintiff's general disagreement with Defendant's assessment of his 2014 performance is discussed within.

On May 1, 2014,[17] Defendant selected La'Tonya Porter for the Technical Services Manager position that had been vacated by McGraw; Andrew Heilman transitioned into a Team Leader position and became Plaintiff's direct supervisor. Pl. 153–55; Mardis Aff. ¶ 6. Mardis explained that the Team Leader position was added at that time so that Switchboard Technicians reported directly to a Team Leader and not the Technical Services Manager after May 1, 2014. *Id.* ¶ 6.

Catoe continued to be the supervisor above Heilman and Porter. On June 24, 2014, another quality-related issue arose in a project on which Plaintiff was the Switchboard Technician. June 24, 2014 email, ECF No. 36-2 at 81–83. Catoe determined it appropriate to administer formal counseling to Jones. Catoe Aff. ¶ 7. Catoe, Porter, and Heilman issued a Letter of Concern to Jones on June 27, 2014. Pl. Dep. 144; June 27, 2014 Letter, ECF No. 36-2 at 84–85. This letter highlighted concern with Plaintiff's job performance that had been discussed with him in "prior coaching and counseling sessions." *Id.* at 84. In particular, the letter listed concerns as to quality of work/accuracy of information, productivity, and "Internal Customer Service (closing the loop)." *Id.* The letter provided specific examples of these deficiencies. For example, regarding productivity, the letter indicated the goal was 1 unit/hour and noted Plaintiff's productivity rate for all of 2013 was .54 units/hour; and, since the beginning of 2014, his rate was .43 units/hour. Concerning his quality of work, the letter indicated the following: "Daily drawing/BOM issues are negatively impacting the production process. Incorrect information provided to assembly/fabrication has resulted in excessive rework and lost productivity. You have been in the Switchboard Technician position for more than two years and there's a concern regarding your comprehension of the overall switchboard tech process, products and position criteria." *Id.* The letter also noted Plaintiff's responses to internal customers had been "untimely and inaccurate on multiple occasions." *Id.* This letter also included "expectations" of

---

[17] In responding to Defendant's Motion, Plaintiff seems to question the date Porter was made supervisor. Pl. Mem. 9 ("To the contrary," Plaintiff submits, Porter was supervisor of the switchboard technicians "most of the time between McGraw's discharge and Plaintiff's discharge."). Plaintiff has provided no record evidence showing Porter's appointment took place on a different date. In any event, the precise date Porter became Plaintiff's supervisor does impact the recommended disposition.

Plaintiff, such as "BOM related questions and repetitive errors/issues should be non-existent"[,] required "continual improvement week over week" of Plaintiff's productivity. *Id.* (noting the expectation is 1 unit/hour). Further, Plaintiff was to focus on quick and accurate responses to assembly and production areas. *Id.* Catoe indicated that, during the meeting with management in which these concerns discussed in the Letter of Concern were raised, Plaintiff acknowledged he was not a good switchboard technician and that he continued to rely heavily on team members for assistance in completing his jobs. Catoe Aff. ¶ 7.

During the June 27, 2014 meeting to discuss the issues raised, Defendant requested that Plaintiff prepare a Performance Improvement Plan ("PIP"), outlining how he planned to meet the expectations of his position. Plaintiff asked, and was given, time to review the documents and consider the request. Mardis Aff. ¶ 7.[18] A few days later, Plaintiff raised concerns to Mardis about Porter's involvement in evaluating and disciplining him. Pl. Dep. 183. Plaintiff advised that he believed Porter and McGraw were personal friends and that Porter had a vendetta against Plaintiff for reporting McGraw's conduct to Defendant. Pl. Dep. 183–84, 208–10.[19]

Out of an abundance of caution and to help alleviate Plaintiff's concerns, Defendant removed both Porter and Heilman from further decisions regarding Plaintiff's PIP and fulfillment of its

---

[18] Although not referenced in his memorandum, Plaintiff's Statement recounts a meeting that took place on "June 20, (approximate date)" in which he was asked to go to HR with Heilman. When he arrived, Catoe, Porter, and HR Representative Jeremy Revitt were present. According to Plaintiff's Statement, when Revitt began to tell Plaintiff his work performance needed to improve, Plaintiff interrupted him to say this "was really about the Kelvin situation." Pl. Stmt., ECF No. 40-4 at 7. Plaintiff noted that Revitt was unaware of that situation. Catoe advised Plaintiff then that "not everyone in here knows about the Kelvin situation." *Id.* Plaintiff suggested everyone be filled in. *Id.* Plaintiff stated it was at that meeting he was asked what he felt he needed to do to improve his performance and asked to list three areas for improvement. Because Plaintiff felt it was incorrect to require such a list, he refused. He asked to take the papers with him, and Revitt gave him some of the papers. Plaintiff was advised he needed to bring the list in the following Monday. He did not do so. *Id.* It appears Plaintiff may be mistaking the date of that meeting for the June 27, 2013 date on which he received the Letter of Concern. In any event, such difference does not impact the undersigned's recommendation.

[19] Plaintiff acknowledged that he did not know whether Porter actually knew why McGraw was terminated. Based on Porter's actions toward Plaintiff, he "felt like" Porter knew. Pl. Dep. 185.

objectives. Mardis Aff. ¶ 7; Pl. Dep. 184. Plaintiff reviewed the Letter of Concern and accompanying PIP form, *see* ECF No. 36-2 at 86, but advised Mardis that he was not going to prepare the PIP objectives. Pl. Dep. 186–187; Mardis Aff, ¶ 8. Accordingly, Catoe and Mardis created Plaintiff's PIP, and set it to last for 30 days from July 11, 2014, the date it was reviewed. Jones Dep. 187; PIP, ECF No. 36-2 at 86–87; Mardis Aff. ¶ 8. Catoe and Mardis signed the PIP on July 11, 2014; Plaintiff's refusal to sign it was so noted on the form.

The PIP addressed each of the three areas where Plaintiff's performance was deficient and set specific tasks and measurements of results. PIP, ECF No. 36-2 at 87. To improve the quality of his work, Plaintiff was instructed to spend at least two hours per day in switchboard assembly and to utilize the "buddy check system" before submitting jobs. *Id.* One of the metrics for determining whether Plaintiff was demonstrating sufficient improvement was the goal of having a 50% decrease in the number of turnbacks. *Id.* To improve the quantity of his work, Jones was directed to track his productivity and meet daily with Heilman to review progress. To measure success in this area, Defendant required "consistent improvement" of Plaintiff's prior hourly production rate of .54 sections per hour. *Id.* To improve his internal customer service, Plaintiff was to respond to inquiries within four hours. Success in the internal-customer-satisfaction area would be shown by Plaintiff's having no internal customer complaints related to unresponsiveness or inaccurate information. *Id.*[20]

Heilman, Plaintiff's direct supervisor from May 1, 2014 until termination, tracked Plaintiff's compliance with the PIP. Heilman Aff. ¶¶ 3–4. Heilman states Plaintiff satisfied the goal of spending two hours each day on the assembly floor only one of the four weeks the PIP was in place. *Id.* ¶ 4. Regarding Plaintiff's PIP goal of improving his .43 production rate, Heilman calculated Plaintiff's weekly productivity rates as 0.43, 0.46, 0.44, and 0.32 per hour. *Id.* ¶ 5. Heilman made these calculations using the hours Plaintiff was working and was not on the assembly floor. *Id.*

---

[20] Plaintiff's contentions that the goals in the PIP were unreasonable and unattainable, *see* Pl. Dep. 192-97, 199, are discussed in detail in the Analysis section of this Report.

On July 15, 2014, while Plaintiff's PIP was in place, Plaintiff sent revisions to the mailroom rather than walking the revisions to the assembly floor. Catoe instructed Plaintiff to take the information to the floor, and he complied with the instruction. Catoe Aff. ¶ 8; July 15, 2014 email chain, ECF No. 36-4 at 13–14. Catoe noted this occurrence as an example of ongoing issues with Plaintiff's quality of work and his responsiveness. Catoe Aff. ¶ 8.

E.    Plaintiff's termination

Plaintiff was terminated effective August 12, 2014. As explained by Catoe:

> Because Jones' performance failed to improve despite the PIP objectives and coaching provided, Detra Mardis, Human Resources Manager, and I made the decision to terminate Jones' employment effective August 12, 2014. La'Tonya Porter, Technical Services Manager, was not involved in this decision, nor did she provide any input regarding it.

Catoe Aff. ¶ 9; *see also* Mardis Aff. ¶ 9; Porter Aff. ¶ 5, ECF No. 36-5.

F.    EEOC Charge

Plaintiff filed an administrative charge of discrimination with the South Carolina Human Affairs Commission ("SHAC") and the United States Equal Employment Opportunity Commission ("EEOC") on January 6, 2015. Pl. Dep. 215–16. EEOC Charge, ECF No. 36-2 at 88. The EEOC issued a Dismissal and Notice of Right to Sue on July 30, 2015. Pl. Dep. 221–22; Right to Sue Letter, ECF No. 36-2 at 89.

III.    Analysis

A.    Plaintiff's Title VII retaliation claim

Plaintiff contends Defendant retaliated against him after he complained about McGraw's harassing him. Because the facts and reasoning supporting Plaintiff's retaliation claim are essential for evaluating his hostile work environment claim, the court considers this Title VII retaliation claim first. *See* Compl. ¶¶ 45–50. Title VII proscribes discrimination against an employee because, in relevant part, he "has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e–3(a). Employees engage in protected oppositional activity when, *inter alia*, they

"complain to their superiors about suspected violations of Title VII." *Bryant v. Aiken Reg'l Med. Ctrs. Inc.,* 333 F.3d 536, 543–44 (4th Cir. 2003). When, as here,[21] direct evidence is lacking, a plaintiff may produce circumstantial evidence and proceed under the *McDonnell Douglas* burden-shifting framework. *See Foster,* 787 F.3d at 249 (confirming the *McDonnell Douglas* framework remains appropriate when Title VII retaliation plaintiff is not proceeding under direct-evidence theory). "To establish a prima facie case of retaliation in contravention of Title VII, a plaintiff must prove '(1) that she engaged in a protected activity,' as well as '(2) that her employer took an adverse employment action against her,' and '(3) that there was a causal link between the two events.'" *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015) (en banc) (quoting *EEOC v. Navy Fed. Credit Union,* 424 F.3d 397, 405–06 (4th Cir. 2005)). If the plaintiff presents a prima facie case, the burden then shifts to the employer to establish a legitimate, non-retaliatory reason for the adverse action. If the employer sets forth a legitimate, non-retaliatory reason for the action, the plaintiff then bears the burden of showing the employer's proffered reasons are pretextual or her claim will fail. *See Price v. Thompson,* 380 F.3d 209, 212 (4th Cir. 2004). In the Title VII retaliation context, a plaintiff must prove retaliation was a but-for cause of the materially adverse action. *See Nassar*, 133 S. Ct. at 2533. In other words, the successful plaintiff in a Title VII retaliation suit must show that the complained-of injury would not have occurred "but for" the alleged retaliatory motive. *Id.; see also id.* at 2524–25. In *Foster*, the Fourth Circuit clarified that the but-for causation standard is not applied at the prima facie stage; rather, the but-for causation requirement is part of a plaintiff's proof at the pretext stage. 787 F.3d at 252.

   1.  Prima facie case

   In its Motion for Summary Judgment, Defendant argues summary judgment is appropriate as to the Title VII claim, focusing on Plaintiff's termination as the materially adverse action at issue. Def. Mem. 14–15. Defendant does not question that Plaintiff's December 16, 2013 report to Catoe and to

---

[21] Plaintiff proceeds using the *McDonnell Douglas* framework. *See* Pl. Mem. 17-19.

HR concerning McGraw's harassment is a protected activity or that his termination is a materially adverse action. Rather, Defendant argues Plaintiff cannot satisfy the prima facie case because he cannot show the presence of a causal relationship between his December 2013 complaint and his August 12, 2014 termination. *Id.* Defendant also argues Plaintiff cannot survive summary judgment by demonstrating pretext, setting out a legitimate, nondiscriminatory reason for the discharge, and arguing Plaintiff cannot establish that his reporting of McGraw was a but-for cause of his termination. Reply 14.

In addition to his termination, Plaintiff includes several other acts or events as allegedly retaliatory adverse employment events:

- Defendant's "'knee jerk'" reaction to Plaintiff's protected activity by sending Plaintiff a "'coaching' reprimand," Pl. Mem. 8, shortly after reporting McGraw;
- Plaintiff's being "transferred to Porter and Catoe's supervision," which is related to Plaintiff's claim that Porter and McGraw were personal friends, Pl. Mem. 8, 18, and the related generalized complaint that "Porter, Catoe, and other employees treated Plaintiff worse than other similarly situated employees." Pl. Mem. 18 (citing generally to Parrott Aff.); and
- Plaintiff's PIP.

Pl. Mem. 8, 17–18 (citing to Parrott Aff. and copies of the performance documents). Without more detail and, notably, without further explanation or legal argument, Plaintiff submits that this "clear sequence of retaliatory actions shows a finite timeline of retaliatory premeditation to lay a paper trail to terminate Plaintiff." Pl. Mem. 18. The court considers each element of Plaintiff's prima facie case.

        a)      Protected activity

Plaintiff's protected activity took place on December 16, 2013, when he reported McGraw's harassment[22] to Catoe and to Mardis in HR. Defendant does not challenge this element of Plaintiff's retaliation claim.

---

[22] For purposes of this Motion, Defendant stipulates McGraw's pre-December 16, 2013 actions satisfy the legal definition of a hostile work environment, or harassment. *See* Def. Mem. 11 (assuming, for purposes of Motion, that Plaintiff can show McGraw's pre-December 16, 2013 conduct was unwelcome, based on sex, and sufficiently severe or pervasive to create a hostile work environment).

b)     Materially adverse action(s)

In its initial Memorandum, Defendant concedes Plaintiff's August 12, 2014 termination was an materially adverse action. Def. Mem. 14. On reply, however, Defendant takes issue with the additional events referenced by Plaintiff in his responsive memorandum, arguing none of those events is considered a materially adverse action for purposes of the retaliation claim. *See* Reply 8-10.

In *White*, 548 U.S. 53, the Supreme Court explained that a different and less strenuous standard is used to define adverse actions in the retaliation context as opposed to other Title VII contexts: "[T]he anti-retaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment." *White,* 548 U.S. at 64. Nonetheless, a plaintiff must show the retaliation produced an "injury or harm." *Id.* at 67 (noting the anti-retaliation provision of Title VII "protects an individual not from all retaliation, but from retaliation that produces an injury or harm."). Thus, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (quotation marks and citations omitted). A plaintiff must show material adversity to separate the significant harms from the trivial because "Title VII  . . . does not set forth 'a general civility code for the American workplace.'" *Id.* (quoting *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80 (1998)). The test is an objective one and considers the reactions of a reasonable employee. *Id.* It is the challenged retaliatory act, not the underlying conduct that gave rise to the Title VII complaint, that is to be examined using this guidance. 548 U.S. at 69. The question is whether the challenged action was material from the perspective of a reasonable person in the plaintiff's position. *Id.* at 69–70.

(1)     December 19, 2013 Letter from Mardis

Plaintiff labels the December 19, 2013 letter from Mardis in HR to Plaintiff as a "coaching reprimand." Nothing in the letter indicates Plaintiff is being reprimanded. Rather, the letter begins with Defendant's expressing its appreciation to Plaintiff for raising concerns and advising Plaintiff that an

internal investigation had been conducted and appropriate action taken. Dec. 19, 2013 Ltr., ECF No. 40-7. The letter continues by reminding Plaintiff of Eaton's Code of Ethics, particularly his obligation immediately to raise issues that may be in conflict with the Code of Ethics, including the reporting of behavior that violates workplace policies. *Id.* The letter noted that ongoing financial support between a manager and employee and the exchange of materials or conversation that might be considered harassment would be examples of conduct that should be reported. *Id.* The letter concludes with Mardis' note to Plaintiff that she is available for assistance and "look[s] forward to [Plaintiff's] continued development as an Eaton professional." *Id.*

Defendant submits this letter was not a "'letter of reprimand' or a disciplinary action in any way." Reply 8. Defendant argues Plaintiff's receiving the letter was not an adverse employment event as it would not be considered "materially adverse" by a reasonable employee. *Id.* (quoting *White*). Plaintiff did not analyze whether the letter would be considered an adverse action in this context.

The undersigned agrees with Defendant that the December 2013 letter to Plaintiff is not an "adverse action" in the retaliation context. The letter began by advising Plaintiff that an investigation had taken place as the result of his complaints. The letter also reminds Plaintiff of his responsibilities under Defendant's policies. Nothing about this letter would "dissuade[] a reasonable worker" from making a charge of discrimination or harassment. *See White*, 548 U.S. at 68. It is recommended the December 19, 2013 not be considered an adverse action for purposes of Plaintiff's retaliation claim. Further, even if considered a "reprimand," Plaintiff has not provided sufficient evidence to cause it to be a materially adverse action as "reprimands without collateral consequences . . . cause no detriment" and "cannot be characterized as 'adverse.'" *Hinton,* 185 F. Supp. 3d at 832 (E.D. Va. 2016) (collecting cases).[23]

_____

[23] The undersigned notes that Plaintiff did not raise the December 2013 Letter as a retaliatory act in his January 6, 2015 EEOC Charge. ECF No. 36-2 at 88. However, Defendant has not raised its untimeliness as an issue in its Motion for Summary Judgment.

(2)     Purported friendship between Porter and McGraw

Plaintiff's claims concerning his supervision and "different" treatment by Catoe and Porter, as well as the allegations that being supervised by Catoe and Porter was a retaliatory action, hinge on allegations that Porter and McGraw were close friends. Plaintiff alleges Porter[24] retaliated against Plaintiff on McGraw's behalf. When asked in deposition how his *termination* was retaliatory, Plaintiff said he based that claim on the friendship between McGraw and Porter combined with McGraw's December 16, 2013 statement to Plaintiff that if he (McGraw) was fired, McGraw would use his connections to have Plaintiff fired. Pl. Dep. 208–09. Plaintiff also generally indicated anyone who knew about the complaint he made about McGraw could have been involved in his termination. *Id.* at 209. He admits that he is unsure who knew of the complaint. Pl. Dep. 209. Although Plaintiff indicated he was "pretty sure" McGraw and Porter still communicated, he acknowledged he could not prove it. *Id.* at 209–10. Plaintiff further indicated it "[m]ay have been" Porter who was involved with his termination, although he did not know." *Id.* at 210.

Plaintiff indicated he had concern about Porter's being a supervisor in Plaintiff's department and that he knew he was "going to get retaliated [against], because [Porter] and [McGraw] [were] buddies." Pl. Dep. 183. Plaintiff recalled McGraw had told him that he "hung out" with Porter and that they "went on trips and met each other on trips and did things together." *Id.* According to Plaintiff, McGraw helped Porter get "some kind of production position on the shop floor." *Id.* at 183–84. *See also* Pl. Stmt. 9. Plaintiff also provides Parrott's affidavit in support of the claim that McGraw and Porter were friends. ECF No. 40-2. Parrott "observed" McGraw and Porter were friends; his "understanding" was that McGraw mentored Porter to follow his career path; and noted the two had kept in touch when working at different plants. Parrott Aff. ¶¶ 42–44. The only specific example of this friendship is an instance in which McGraw enlisted Parrott to provide Porter with an updated

---

[24] The tie between McGraw and Catoe on which Plaintiff relies is less clear.

engineering drawing title block when she called from another plant and asked for the information. *Id.* ¶ 45.

The only other evidence regarding the purported friendship between McGraw and Porter comes from Porter. In her affidavit, Porter indicates that although she was "acquainted with McGraw through working with him at Eaton, [they] did not have friendship or relationship outside of [their] professional relationship." Porter Aff. ¶ 3, ECF No. 36-5. Porter also stated that "[n]either McGraw nor Eaton advised [her] regarding the reasons McGraw left Eaton's employment." *Id.* ¶ 4. Porter stated she had no animosity toward Plaintiff because he had made a complaint concerning McGraw; she also indicated she was not involved with the decision to terminate Plaintiff, nor did she have any input in that decision. *Id.* ¶¶ 3, 5.

Defendant looks to Porter's sworn testimony as establishing that McGraw and Porter were not social friends. Defendant argues the other evidence Plaintiff has provided is insufficient to demonstrate such a friendship. Def. Mem. 7 n.6. Defendant acknowledges Plaintiff's testimony that McGraw had told Plaintiff that McGraw and Porter were friends and went on trips together. *Id.* (citing Pl. Dep. 201). However, Defendant asserts Plaintiff's testimony is only "unsubstantiated speculation" and Plaintiff has "no personal knowledge regarding the degree of friendship between Porter and McGraw; he only knows what McGraw related to him." *Id.* (citing Pl. Dep. 201). Defendant also argues the information from Parrott lacks foundation and is hearsay and conclusory. Def. Reply 9.

To be sure, Plaintiff's evidence of a McGraw-Porter friendship is thin. Nonetheless, although this is a close call, the undersigned is of the opinion Plaintiff has created an issue of fact as to the extent of the relationship between McGraw and Porter. Through this opinion, the undersigned does not purport to make any ruling concerning whether Plaintiff's evidence of a McGraw-Porter friendship could carry the day at any eventual trial. At this stage, though, the court is to take all evidence and inferences to be drawn therefrom in the light most favorable to Plaintiff. *See* Fed. R. Civ. P. 56(c)(2)

(noting a party must identify materials that can be presented "in a form that *would be* admissible in evidence") (emphasis added).

That an issue of fact exists as to the scope of any friendship between McGraw and Porter, in and of itself, does not mean Plaintiff has set forth a prima facie case. Rather, accepting the possibility of such a friendship, the court must still consider whether Plaintiff has set out materially adverse actions (and the other elements of his proof).

(3)     Transfer to Porter's and Catoe's supervision; claimed "cold" treatment by Porter, Catoe, and others

Plaintiff argues his "transfer" to supervision by Porter and Catoe was retaliatory. As Defendant points out, however, there was no transfer involved that caused Plaintiff to be supervised by Catoe and then by Porter and Heilman. As McGraw's supervisor, Catoe became the de facto supervisor of Plaintiff and all Switchboard Technicians upon McGraw's termination. *See* Pl. Dep. 153. As of May 1, 2014, Heilman became Team Manager and Plaintiff's first-line supervisor. That same day, Porter filled the Technical Services Manager position vacated by McGraw. Mardis ¶ 6; *see* Pl. Dep. 153–54. Nothing in the record suggests the management structure over Plaintiff was different from that of other Switchboard Technicians.

While Plaintiff seems to claim that having Catoe as his supervisor was retaliatory, Plaintiff's support for this argument is far from clear. Plaintiff submits that Catoe and Porter were "cold" to him after the reporting, although he provides no evidence other than that from Parrott as foundation for this argument, nor does he in any manner "connect the dots" to show how Catoe retaliated against Plaintiff simply by being his manager. Simply being supervised by Catoe is not, of itself, a materially adverse act.

Plaintiff also claims Catoe, Porter, and "some of Defendant's other employees, such as Steve Hood" began treating Plaintiff differently than similarly situated employees after Plaintiff reported McGraw's conduct. Pl. Mem. 8, 18. Plaintiff further submits his "transfer to Porter and Catoe's

26

supervision" was retaliatory, based on a friendship between Porter and McGraw. Pl. Mem. 8, 18. The only record support Plaintiff provides for his claims of being treated differently come from the affidavit of Plaintiff's former coworker, Parrott. *See* Pl. Mem. 8, 18 (citing generally to "Exhibit 2," which is the Parrott Aff.).[25]

As noted above, many of Parrott's statements in his affidavit are inadmissible or irrelevant because they offer only Parrott's suppositions concerning Plaintiff. *E.g.* Parrott Aff. ¶ 10 (observing Plaintiff "worked hard for career advancement"); ¶ 11 (noting Plaintiff "seemed to do his job per the company's expectations"). Further, some of Parrott's statements relayed observations that generally had become common knowledge around the plant without providing a factual foundation for such statements. *See id.* ¶ 36 (indicating it "was clear to everyone around the plant" that McGraw had been terminated and "common knowledge" that Plaintiff "was somehow involved" with the termination).

Parrott "observed" that Plaintiff was treated in a worse manner by Porter, Catoe, and some coworkers, including Hood.[26] Parrott Aff. ¶ 37. Hood had assisted Plaintiff before McGraw left, according to Parrott. However, after McGraw left, Parrott recounted an incident in which Hood declined Plaintiff's request for advice and Hood told Plaintiff to ask his trainer instead. *Id.* ¶ 38. Parrott avers that Catoe and Porter "were very hands off" with Plaintiff after McGraw left. *Id.* ¶ 46. Parrott characterized Catoe and Porter as interacting with "coldness" toward Plaintiff. Parrott also indicates he "noticed" that Porter "did not develop [Plaintiff's] performance or day-to-day activities and she did not

---

[25] Plaintiff's general citation to Parrott's 9-page, 45-paragraph affidavit is but one example of Plaintiff's failing to comply with Local Civil Rule 7.05(A)(4), which requires that memoranda opposing a motion for summary judgment "shall" contain a "concise statement of the material facts in dispute with reference to the location in the record." Local Civ. Rule 7.05(A)(4) (D.S.C.). *See also* Fed. R. Civ. P. 56(c)(1)(A) (requiring citation to "particular parts of materials in the record"). The court is chagrined by this failure to follow such directives. *Cf. Foster*, 787 F.3d at 254 (when counsel did not provide specific record cites to support pretext argument, the Fourth Circuit noted violation of a similar rule of appellate procedure and stated, "Counsel is admonished to show greater respect for both his client's interests and the Court's time in his future appearances before this Court."). Again, it is not the court's job to scour the record for details or to independently determine where facts may be located in the record.
[26] According to Parrott, during Plaintiff's employment Hood was a lead technician and one of the most experienced technicians. Parrot Aff. ¶ 18.

greet him in the same way she spoke to others." *Id.* Much of Parrott's testimony would be inadmissible.

In finding "petty slights and minor annoyances" not to be actionable materially adverse events, the Court referenced "'snubbing by supervisors and co-workers.'" *White*, 548 U.S. at 68 (quoting 1 B. Lindemann & P. Grossman, Employment Discrimination Law 669 (3d ed. 1996) (additional internal quotation omitted); *see also Shannon v. Va. Dep't of Juvenile Justice*, No. CIV. A. 3:06CV413, 2007 WL 1071973, at *4 (E.D. Va. Apr. 4, 2007), *aff'd sub nom. Shannon v. Commonwealth of Va. Dep't of Juvenile Justice*, 258 F. App'x 583 (4th Cir. 2007) (finding several alleged retaliatory actions, including unfriendly treatment by coworkers not to be "materially adverse" for Title VII retaliation claim). Similarly, the undersigned is of the opinion that Plaintiff's claims of cold treatment and generally being managed by Catoe and Porter are not materially adverse actions for purposes of proving his prima facie retaliation claim.

(4)    2014 Letter of Concern and PIP

Focusing on his PIP and referencing the June 27, 2014 Letter of Concern, Plaintiff claims his negative evaluations in 2014 were materially adverse actions.[27] Plaintiff claims an adverse employment impact based on the June 27, 2014 Letter and his PIP that eventually led to his

---

[27] To the extent Plaintiff is arguing the March 2014 evaluation given by Catoe, ECF No. 36-2 at 72-76, is a materially adverse event, such claim should fail. While Plaintiff is correct that the 2014 evaluation gave him an overall rating of N3 or "Needs Improvement," as compared to the 2013 rating of P3 or "Average Performance," the issues addressed in the 2014 evaluation are, in large, measure, the same issues raised in the 2013 evaluation and in other communications to Plaintiff in 2013. *See id.* (noting Plaintiff "consistently has quality related issues and doesn't appear to learn from past mistakes."); *see also* Jan. 3, 2013 email from Catoe to McGraw, ECF No. 36-4 at 5 (noting "ongoing problem" with quality issue and the need to discuss with Plaintiff); Aug. 22, 2013 email from Catoe to McGraw, ECF No. 36-4 at 9 (noting ongoing issue with Plaintiff's completion of tasks). The undersigned finds that an objectively reasonable person would not be dissuaded from engaging in protected activity by receiving an evaluation such as the one Plaintiff received in March 2014.

Similarly, the emails in Plaintiff's file from March and June 2014 that note performance issues, ECF No. 36-2 at 77-83, originated from personnel other than Catoe and Porter. Further, the issues noted echo issues with quality and follow-through that had been mentioned before. The emails create no materially adverse incident.

termination. Plaintiff claims these were retaliatory because he "had a positive record of employment with Defendant prior to his sexual harassment complaint." Pl. Mem. 18 (citing Compl).

Neither party has included argument or authority discussing whether the June 27, 2014 Letter or the PIP would be considered to have had a materially adverse impact. Plaintiff argues the Letter and PIP continued to judge him unfairly and place unattainable standards on him. Pl. Mem. 18. On Reply, Defendant challenges Plaintiff's characterization of the December 2013 letter as a materially adverse act, but does not argue the Letter or the PIP was not materially adverse for purposes of Plaintiff's prima facie case. Rather, Defendant considers the June 2014 Letter and the PIP in the context of a pretext argument. *See* Reply 10–11. The undersigned notes, too, that Plaintiff's burden of showing materiality in this context is not onerous. *See generally Bradley v. U.S. Foods, Inc.*, No. 4:14-CV-1772-RBH, 2015 WL 5158731, at *7 (D.S.C. Sept. 2, 2015) (noting burden of showing material adversity in retaliation context is less onerous than showing adverse action in discrimination context). Accordingly, the undersigned will assume the June 27, 2014 Letter of Concern, the PIP, and the termination were materially adverse for purposes of the prima facie retaliation claim.[28]

c)    Prima facie causation

To establish his prima facie case, Plaintiff must also show a causal link between these materially adverse events and his December 2013 protected activity. "[A] causal connection for purposes of demonstrating a prima facie case exists where the employer takes adverse employment action against an employee shortly after learning of the protected activity." *Price v. Thompson,* 380 F.3d 209, 213 (4th Cir. 2004). However, the temporal nexus between two events cannot provide proof of causation unless the "temporal proximity between an employer's knowledge of protected activity and an adverse employment action" was "very close." *Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273 (2001) (internal quotation marks omitted). When temporal proximity is absent, "evidence of

---

[28] This is not to say that the undersigned is of the opinion that all performance letters, or performance-improvement-based goals should always be considered to have materially adverse impacts on employment.

recurring retaliatory animus during the intervening period can be sufficient to satisfy the element of causation." *Lettieri v. Equant Inc.*, 478 F.3d 640, 650 (4th Cir. 2007) (citing *Farrell v. Plantars Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000), and *Miles,* 429 F.3d at 490 (noting the Fourth Circuit's determination in *Causey v. Balog,* 162 F.3d 795, 803 (4th Cir. 1998) that a 13-month interval, without more, would not establish prima facie causation).

Defendant argues Plaintiff cannot show prima facie causation, arguing the documented work-performance issues negate any causal link between the December 2013 activity and the August 2014 termination. Def. Mem. 14–15 (focusing on termination as only materially adverse event). As discussed above, Plaintiff raised additional events as part of his claimed "clear sequence of retaliatory actions" that purportedly shows a "finite timeline of retaliatory premeditation to lay a paper trail to terminate Plaintiff." Pl. Mem. 18. As an initial matter, the undersigned agrees with Defendant's argument in its initial brief that the time period between the activity (December 2013) and the termination itself (August 2014) does not, in and of itself, show sufficient temporal proximity to establish an inference of prima facie causation. *See* Def. Mem. 15. The undersigned questions whether the timespans between the December 2013 protected activity and the June 27, 2014 Letter and between the December 2013 reporting and the July 2014 PIP are sufficient to show prima facie causation. Nonetheless, the undersigned notes it is a close call. In considering all facts in the light most favorable to Plaintiff, and giving him the benefit of every possible inference, the undersigned recommends finding that Plaintiff has provided just enough to meet his "less onerous" burden of establishing prima facie causation (as opposed to causation at the pretext stage). *Foster*, 787 F.3d at 251. Arguably, a jury permitted to consider McGraw's threat to Plaintiff just before Plaintiff reported him, evidence of a friendship between Porter and McGraw, and Porter's at-least-partial involvement in Plaintiff's 2014 performance evaluations (the June 2014 Performance Letter) could draw a prima facie causal connection between the reporting and the adverse events, including termination. *See generally Lettieri*, 478 F.3d at 650 (noting seven-month period between protected activity and termination insufficient to

establish causal link; however, retaliatory conduct and animus such as increased scrutiny and lowering performance reviews in the interim could supply prima facie causation). In any event, on reply Defendant focuses its causation argument more in the context of a pretext analysis. *See* Reply 11 (focusing argument on whether Plaintiff has shown the protected activity was the "real reason" for his termination). Accordingly, the undersigned now considers Plaintiff's Title VII retaliation claim under *McDonnell Douglas*'s burden-shifting pretext framework.

      2.    Pretext

If the plaintiff presents a prima facie case, the burden then shifts to the employer to establish a legitimate, non-retaliatory reason for the adverse action. If the employer sets forth a legitimate, non-retaliatory reason for the action, the plaintiff then bears the burden of showing the employer's proffered reasons are pretextual or his claim will fail. *See Price v. Thompson,* 380 F.3d 209, 212 (4th Cir. 2004). In the Title VII retaliation context, a plaintiff must prove retaliation was a but-for cause of the materially adverse action. *See Nassar*, 133 S. Ct. at 2533. In other words, the successful plaintiff in a Title VII retaliation suit must show that the complained-of injury would not have occurred "but for" the alleged retaliatory motive. *Id.; see also id.* at 2524–25.

In considering whether Plaintiff should survive summary judgment on the pretext prong, the court is mindful of this recent recounting of the standard provided by the Fourth Circuit when reviewing a district court's grant of summary judgment as to a Title VII retaliation claim:

> The sole issue on appeal, therefore, is whether [Plaintiff] met [his] summary judgment burden of demonstrating a genuine dispute of material fact on the question of pretext sufficient to make [Defendant's] proffered justification a triable issue. *Foster*, 787 F.3d at 254; *see also King v. Rumsfeld*, 328 F.3d 145, 154 (4th Cir. 2003) (Gregory, J., dissenting) ("To survive summary judgment, however, King need not squarely rebut his employer's explanation. Instead, King must cast sufficient doubt upon the genuineness of the explanation to warrant a jury's consideration of possible alternative and discriminatory motivations for the firing.").

*Guessous v. Fairview Prop. Investments, LLC*, 828 F.3d 208, 217–18 (4th Cir. 2016).

a)      Legitimate, nondiscriminatory reason

Here, Defendant has satisfied its burden of setting forth a legitimate, nondiscriminatory reason for Plaintiff's reviews, PIP, and termination: his poor performance, including issues with productivity, quality of production, and follow-through with internal clients. *See, e.g.*, April 2013 Review by McGraw, ECF No. 36-2 at 69–71; Chart of Tech Errors, Sept. 1 through November 12, 2013, ECF No. 36-4 at 11 (indicating Plaintiff had highest number of errors); emails between McGraw and Catoe, ECF No. 36-4 at 5–7; March 2014 Review by Catoe, ECF No. 36-2 at 72–76; March and June 2014 emails concerning work product, ECF No. 36-2 at 77–83. Catoe gave Plaintiff a "Needs Improvement" on his 2014 annual review and provided him with feedback and constructive criticism. Plaintiff failed to improve, and he was issued a Letter of Concern and Performance Improvement Plan two months prior to his termination. June 2014 Letter, ECF No. 36-2 at 84–86; PIP, ECF No. 36-2 at 87. A few days after the PIP was in place, Plaintiff expressed concerns to Mardis that Porter was "targeting him" based on a personal friendship with McGraw. Mardis Aff. ¶ 7. In response to those concerns Defendant "decided to remove [Porter] and Heilman from further decisions regarding Jones' PIP and the fulfillment of its objectives." *Id.*

Although Mardis indicated neither Porter nor Heilman was involved in further managerial decisions as to how to handle Plaintiff's PIP performance, Heilman remained Plaintiff's direct supervisor from May 1, 2014 until termination, and, under the terms of the PIP, Heilman was responsible for tracking Plaintiff's compliance with the PIP. Heilman Aff. ¶¶ 3–4.[29] Heilman states Plaintiff satisfied the goal of spending two hours each day on the assembly floor during only one of the four weeks the PIP was in place. *Id.* ¶ 4. Regarding Plaintiff's PIP goal of improving his .43 production rate, Heilmann calculated Plaintiff's weekly productivity rates as 0.43, 0.46, 0.44, and 0.32 per hour. *Id.* ¶ 5. Heilmann made these calculations using the hours Plaintiff was working and was not on the assembly floor. *Id.* Catoe also noted ongoing issues with Plaintiff's quality of work and his

---

[29] Plaintiff has raised no concerns regarding his being supervised by Heilman.

responsiveness. Catoe Aff. ¶ 8. Plaintiff was terminated effective August 12, 2014. As explained by

Catoe:

> Because Jones' performance failed to improve despite the PIP objectives and coaching
> provided, Detra Mardis, Human Resources Manager, and I made the decision to
> terminate Jones' employment effective August 12, 2014. La'Tonya Porter, Technical
> Services Manager, was not involved in this decision, nor did she provide any input
> regarding it.

Catoe Aff. ¶ 9; *see also* Mardis Aff. ¶ 9; Porter Aff. ¶ 5, ECF No. 36-5.

         b)      Pretext and but-for causation

To survive summary judgment in the retaliation context, Plaintiff must demonstrate those

reasons given by Defendant are pretextual and retaliation was a but-for cause of his termination.

*Nassar*, 133 S. Ct. at 2533. In other words, Plaintiff must provide proof "that the unlawful retaliation

would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.*

As the Fourth Circuit Court of Appeals recently reiterated, though:

> [A plaintiff's] burden is only to show that the protected activity was a but-for cause of
> h[is] termination, not that it was the sole cause. *Foster*, 787 F.3d at 252; *see also
> Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 507 (6th Cir. 2014) ("[I]n
> retaliation cases, courts must determine 'what made [the employer] fire [the employee]
> <u>when it did</u>.'" (emphasis and alteration in original) (quoting *Hamilton v. Gen. Elec. Co.*,
> 556 F.3d 428, 436 (6th Cir. 2009))).

*Guessous*, 828 F.3d at 218. Here, then, Plaintiff has the burden of establishing Defendant gave him the

Letter of Concern and the PIP and terminated him when it did because he engaged in protected activity

in December 2013.

      While Plaintiff's brief generally acknowledges his burden of establishing pretext, *see* Pl. Mem.

17, he does little more than set out the claimed materially adverse actions and stating his and his

coworker Parrott's opinions that Plaintiff's negative reviews were incorrect. Plaintiff's analysis is

conclusory at best. For example, he argues the "clear sequence of retaliatory actions shows a finite

timeline of retaliatory premeditation to lay a paper trail to terminate Plaintiff." Pl. Mem. 18. To the

extent Plaintiff seeks to rest on the temporal relationship between the protected act and the materially

adverse actions to carry his burden of showing pretext, that argument fails. *See Williams v. Cerberonics, Inc.,* 871 F.2d 452, 457 (4th Cir. 1989) (finding temporal connection between protected activity and adverse action, while sometimes sufficient to demonstrate causal link for prima facie retaliation claim, "far from conclusively establishes the requisite causal connection" necessary for employee to demonstrate pretext). Furthermore, "[n]aked allegations of a causal connection between plaintiff's protected activity and the alleged retaliation do not state a plausible Title VII claim." *Huckelba v. Deering*, No. 5:16-CV-247-D, 2016 WL 6082032, at *3 (E.D.N.C. Oct. 17, 2016) (citing *McCleary-Evans v. Md. Dept. Transp.*, 780 F.3d 582, 585–88 (4th Cir. 2015)).

Plaintiff argues that he "had a positive record of employment" prior to making his complaint about McGraw. Pl. Mem. 18 (citing only to Compl.). Record evidence of his pre-December-2013 evaluation and other records belie that assertion. *See* Apr. 2013 Eval.; emails between McGraw and Catoe. Nor does Plaintiff's attempt to "defend" his performance through his own testimony and that of his former coworker Parrott provide evidence to support pretext. As an initial matter, much of Parrott's testimony as to Plaintiff's performance is speculative and without foundation. *E.g.* Parrott Aff. ¶ 10 ("observed" that Plaintiff worked hard to learn his position, and "seemed to do his job per the company's expectations"). Additionally, Plaintiff acknowledged the PIP's requirement that he increase his performance numbers was a reasonable one. Pl. Dep. 196.

Further, it is not the perception of the employee himself (or that of his coworker) that is to be considered. As discussed in *DeJarnette v. Corning Inc.,* 133 F.3d 293, 299–300 (4th Cir. 1998), the court has repeatedly explained that "'[i]t is the perception of the decision maker which is relevant,' not the self-assessment of the plaintiff." *Evans v. Techs. Applications & Serv. Co.,* 80 F.3d 954, 960–61 (4th Cir. 1996) (quoting *Smith v. Flax,* 618 F.2d 1062, 1067 (4th Cir. 1980)). Accordingly, the plaintiff's "perception of himself . . . is not relevant." *Smith,* 618 F.2d at 1067. Similarly, that Plaintiff's coworker "may have thought that [he] did a good job, or that [he] did not 'deserve' [to be discharged], is close to irrelevant." *Conkwright v. Westinghouse Elec. Corp.,* 933 F.2d 231, 235 (4th

Cir. 1991) (footnote omitted). Neither Plaintiff's nor Parrott's perceptions about Plaintiff's job performance is competent evidence of pretext. Parrott provides no foundation for his observations, nor is he in a position of authority such that he would have specific knowledge about his co-workers' job performance. For example, Parrott purports to provide reasons legitimizing Plaintiff's reduced production numbers by claiming Plaintiff's quota was only one-half unit per hour because of the complexity of Plaintiff's position. Parrott Aff. ¶¶ 14–15. Parrott is not a supervisor. Catoe, who is a supervisor in this area, indicates Parrott's suggestion that Plaintiff's quota would be one-half unit per hour is unfounded. Rather, Catoe explains, those working in Plaintiff's area's quota is one-unit per hour, which is lower than the quota for those in other areas. Second Catoe Aff. ¶¶ 4–7, ECF No. 44-2. Plaintiff cannot create an issue of fact based on Parrott's unsubstantiated musings on Plaintiff's performance quotas or job performance.

Although Plaintiff's April 2013 evaluation gave him an overall "Average Performance" rating and his March 2014 gave him a "Needs Improvement" rating, the substance of issues raised in the 2014 evaluation virtually mirrored the issues identified in his April 2013 evaluation. *Compare* ECF No. 36-2 at 69–71 *with id.* at 72–76. The same or similar issues with productivity, quality, and follow-through continued, prompting the Letter of Concern, PIP, and eventual termination. Plaintiff has not provided competent evidence from which a reasonable juror could conclude Plaintiff's performance issues raised were mere pretext for retaliatory action.

Plaintiff has not established that retaliatory conduct was a but-for cause for terminating him. *See Nassar*, 133 S. Ct. at 2534. Summary judgment is appropriate.

B.      Plaintiff's Title VII hostile work environment claim

To make out a claim of hostile work environment under Title VII, "a plaintiff must show 'that the offending conduct (1) was unwelcome, (2) was because of [sex], (3) was sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive work environment, and (4) was imputable to [his] employer.'" *Ziskie v. Mineta*, 547 F.3d 220, 224 (4th Cir. 2008) (quoting

35

*Ocheltree v. Scollon Prods., Inc.*, 335 F. 3d 325, 331 (4th Cir. 2003)). Defendant argues summary judgment is appropriate because this claim is untimely. Defendant also argues the merits of the claim, assuming for purposes of this motion only that Plaintiff has shown unwelcome conduct that was because of sex, was sufficiently severe and was pervasive to alter the conditions of Plaintiff's employment, and created an abusive work environment. Def. Mem. 11. Defendant challenges the fourth prong, arguing the hostile work environment is not actionable because it is not imputable to Defendant. The court considers these challenges in turn.

        1.      Timeliness challenge

Plaintiff was required to file a charge of discrimination with SHAC or the EEOC within 300 days of the alleged wrongful event. 42 U.S.C. § 2000e-5(e)(1). Charges filed outside that timeframe are barred, and the allegations in the charge "generally operate to limit the scope of any subsequent judicial complaint. Only those discrimination claims stated in the original charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII lawsuit." *Evans*, 80 F.3d at 962 (internal citations omitted). Under Title VII, the filing of a charge of discrimination is a statutory prerequisite to filing a lawsuit. 42 U.S.C. § 2000e-5(e)(1). "The purposes of this requirement include putting the charged party on notice of the complaint and allowing the EEOC to attempt reconciliation." *Causey*, 162 F.3d at 800–01.

In the hostile work environment context, a claim is most often composed of a series of separate acts that collectively constitute one "unlawful employment practice," and the claims are subject to a "continuing violation." *Guessous*, 828 F.3d at 221. For purposes of timeliness, if an act contributing to the hostile-work-environment claim falls within the applicable filing period (here, 300 days), "the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.* at 222 (internal quotation omitted). Even if most of the harassing conduct on which a plaintiff relies to establish his hostile work environment claim occurred outside the statutory

period, the claim will be considered timely if at least one act continuing the violation occurred within the statutory period. *Id.*

Plaintiff's Charge was filed on January 6, 2015. EEOC Charge, ECF No. 36-2 at 88. Here, Defendant asserts the Charge is untimely as to the harassment claim because the Charge was filed more than 300 days after December 16, 2013—the date Plaintiff complained to Defendant about McGraw's actions and what Defendant submits was the last act of harassment. Def. Mem. 10–11. Defendant cites to Plaintiff's deposition testimony stating McGraw stopped harassing him "pretty much when he was fired,"[30] Pl. Dep. 127, and neither McGraw nor anyone with Eaton sexually harassed him after he reported McGraw in December 2013, *id.* at 150–51.

In response, Plaintiff does not argue the Charge would be timely for a hostile-work-environment claim that had its last act in December 2013. Rather, Plaintiff submits the following argument:

> Although the sexual harassment stopped in the workplace when McGraw was terminated on December 18, 2013, Defendant continued to discriminate and *retaliate* against Plaintiff based on his complaints about the sexual harassment from the date of his reprimand for allegedly violating company policy until his termination on August 12, 2014.

Pl. Mem. 12 (emphasis added).[31] Other than referencing his "reprimand," Plaintiff provides no additional detail or discussion of additional acts that he claims relate to the "continuing" sexual harassment.

The undersigned agrees with Defendant that the hostile-work-environment claim is untimely. Unquestionably, for an act to be a part of a continuing harassing environment based on sex (as is claimed here), the additional act itself must satisfy the legal definition of a hostile work environment. Assuming for purposes of argument that Plaintiff is contending the alleged reprimand, negative

---

[30] McGraw was terminated on December 18, 2013, two days after Plaintiff complained to Defendant.

[31] Plaintiff briefly indicates he "put the EEOC on notice of the adverse actions taken against him on December 12, 2014[,]" Pl. Mem. 12, but does not provide any record evidence of such notice or legal argument as to any potential significance of that notice-date.

evaluation, Letter of Concern, PIP, and Termination are the "continuing" acts at issue, Plaintiff has made no argument that such acts satisfy the definition of a hostile work environment and were a part of his *sexual* harassment. Rather, as the above-quoted sentence from Plaintiff's memorandum indicates, Plaintiff considers such additional "actions" part of his claim of retaliation against him "based on his complaints about the sexual harassment." Pl. Mem. 12. These other "actions" have been analyzed in depth above as part of Plaintiff's retaliation claim. Because they are not actions even allegedly "based on sex," they are not to be considered as any part of a continuation of the sexual harassment claim. Summary judgment is appropriate because that claim was not timely presented to the EEOC in a charge.

In addition, Plaintiff claims McGraw continued to "harass" Plaintiff even after McGraw left Eaton, Pl. Mem. 6–7, alleging McGraw removed money from Plaintiff's bank account in May 2013, *see* Pl. Statement 12, and suggesting McGraw's prior access to Plaintiff's personal information had facilitated the unauthorized removal of money. Pl. Mem. 6–7. To the extent Plaintiff is arguing this "harassing" act is another act in the harassing hostile work environment claim, that argument is without merit. The undersigned agrees with Defendant that this act would not be considered sexual harassment because it was not "because of sex," is unrelated to employment, and took place when McGraw was no longer employed with Eaton. *See* Def. Reply 43–44.

Summary judgment as to Plaintiff's hostile-work-environment claim is appropriate because that claim was not timely presented to the EEOC.

## 2.     Imputation

If considered on its merits, Defendant argues summary judgment remains appropriate because McGraw's harassing conduct is not imputable to it. Def. Mem. 11–13. Defendant acknowledges that employers may be vicariously liable for an actionable hostile work environment created by a supervisor. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 764–65 (1998); *Faragher v. Boca Raton,* 524 U.S. 775, 807–08, (1998). Here, though, Defendant seeks to avail itself of the affirmative

defense available when no tangible employment action is taken as the result of the actionable hostile work environment—known as the "*Ellerth/Faragher*" defense based on the name of the two Supreme Court decisions decided on the same day in 1998.

As the *Ellerth* Court explained:

> When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed. Rule Civ. Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. While proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense. And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing any unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense. No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.

*Ellerth*, 524 U.S. at 765. *See also Johnson v. Holder*, No. 4:10-CV-01222-JMC, 2013 WL 789985, at *3 (D.S.C. Mar. 4, 2013) (noting the "*Ellerth/Faragher* defense allows an employer to avoid strict liability under Title VII for a supervisor's sexual harassment of an employee if no tangible action was taken against the employee and the employer can establish that it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior and . . . that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid such harm otherwise.'" (quoting *Matvia v. Bald Head Island Mgmt., Inc.,* 259 F.3d 261, 266–67 (4th Cir. 2001)).

Defendant argues that, because McGraw did not take any tangible employment action against Plaintiff, Eaton is entitled to raise the affirmative defense and that the defense entitles it to summary judgment. Def. Mem. 12–13. Plaintiff appropriately does not dispute that no tangible employment action was taken as part of McGraw's harassing behavior. In *Ellerth,* the Court defined a "tangible

employment action" as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." 524 U.S. at 761. As discussed above, Plaintiff's termination, while certainly a tangible employment action, is more appropriately considered in relation to Plaintiff's retaliation cause of action. Plaintiff challenges Defendant's request for summary judgment, arguing Defendant has not established the *Ellerth/Faragher* affirmative defense. Pl. Mem. 13–17. The undersigned considers the two elements of the defense.

a)     Reasonable care to prevent and correct

In *Brown v. Perry*, 184 F.3d 388 (4th Cir. 1999), the United States Court of Appeals for the Fourth Circuit found that the employer's anti-harassment policy was sufficient to satisfy the first element of taking reasonable care to prevent and correct promptly any sexually harassing behavior. The court noted that the first element could be met with such a policy if it is "both reasonably designed and reasonably effectual." *Id.* at 396. The court held that where "there is no evidence that an employer adopted or administered an anti-harassment policy in bad faith or that the policy was otherwise defective or dysfunctional, the existence of such a policy militates strongly in favor of a conclusion that the employer 'exercised reasonable care to prevent' and promptly correct sexual harassment." *Id.* (quoting *Faragher*, 524 U.S. at 807).

Here, Plaintiff does not dispute that Defendant promulgated policies prohibiting harassment and concerning how to report complaints, *see* Pl. Mem. 14; Plaintiff also testified that he was aware of these policies, Pl. Dep. 66–67. Plaintiff argues, however, that Defendant's HFW Policy was "not reasonably designed or reasonably effectual because it failed to take into consideration that an employee harassed by his supervisor will fear losing their job after reporting" conduct that violated the anti-harassment policy, "especially if such an employee did not report the sexual harassment immediately, as in the Plaintiff's case." Pl. Mem. 14. Plaintiff argues it is "understandable" why he "would be hesitant to report McGraw" shortly after obtaining his position with Defendant. *Id.* Plaintiff

40

also argues Defendant "should have known McGraw" harassed him based on multiple messages on the computer system and sent by a mobile telephone with Eaton information on the signature block. *Id.*

The undersigned is unpersuaded by Plaintiff's argument that Defendant's policy was not effective because it did not take into consideration that an employee may be hesitant to report. To the contrary, the undersigned agrees with Defendant that anti-harassment policies generally exist to make employees feel more comfortable with reporting harassment. Defendant's policy expressly provides that reporting employees "will be protected from retaliation." ECF No. 36-3 at 8. "'An employee's subjective belief in the futility of reporting a harasser's behavior is not a reasonable basis for failing to take advantage of any preventive or corrective opportunities provided by the employer.'" *Johnson*, 2013 WL 789985, at *3 (quoting *Barrett v. Applied Radiant Energy Corp*. 240 F.3d 262, 268 (4th Cir. 2001)).

Plaintiff also argues Defendant "did not exercise care to prevent and promptly correct sexually harassing behavior towards Plaintiff" because Defendant "knew or should have known that McGraw harassed Plaintiff." Pl. Mem. 14. As an initial matter, the undersigned notes that, within *two days* of Plaintiff's putting Defendant on notice of McGraw's behavior, Defendant took action by terminating McGraw. Pl. Dep. 148; Mardis Aff. ¶ 4. It is difficult to imagine how Defendant could have more "promptly correct[ed]" the issue Plaintiff reported.

Further, Plaintiff's argument that Defendant failed to exercise care because it "should have known" about the ongoing harassment because of messages on the company's email system and messages from McGraw's phone that included the company's information and because Plaintiff's non-supervising coworkers noticed McGraw treated Plaintiff differently, Pl. Mem. 14, is unavailing. Proffered evidence from coworker Parrott that he and others observed differing treatment and that at some point Plaintiff "seemed uncomfortable" around McGraw is speculative and without foundation. In any event, Plaintiff does not argue that any of his coworkers notified Defendant of this allegedly different treatment. The only record evidence indicates Defendant's HR representative was not aware

of any complaints Defendant about McGraw's allegedly harassing behavior towards Plaintiff or otherwise prior to Plaintiff's December 2013 report. Mardis Aff. ¶ 4.

There is no competent evidence to which Plaintiff points that Defendant had any idea it needed to observe McGraw more closely or investigate his behavior by systematically reviewing his emails or phone messages. For example, the record includes no evidence that other managers were regularly in the Technicians' work area.

Because McGraw was a supervisor, knowledge of his harassing actions is imparted on Defendant. However, the *Ellerth/Faragher* affirmative defense permits employers to establish an affirmative defense to this vicarious liability. Here, Defendant has satisfied the first element of that defense—that it exercised care to prevent and correct sexually harassing behavior. Defendant's antiharassment policy alone may be considered to establish this prong. *See Ellerth*, 524 U.S. at 765. Here, Plaintiff's argument that Defendant should be liable for McGraw's behavior *before* it was reported is unavailing. To accept this argument would effectively excuse Plaintiff's dereliction in reporting the harassment, which, as discussed below, is not appropriate. The undersigned is of the opinion that Defendant has satisfied the first element of the affirmative defense.

b)      Failure to take advantage of Defendant's preventative opportunities

The undersigned also recommends a finding that Defendant has established the second element of the *Ellerth/Faragher* defense. As noted by the Fourth Circuit, when harassed by a supervisor and no tangible employment action was taken, "the victim is compelled by the *Ellerth/Faragher* defense to make an internal complaint, i.e., "'to take advantage of any preventive or corrective opportunities provided by the employer.'" *Boyer-Liberto*, 786 F.3d at 282 (quoting *Faragher,* 524 U.S. at 807). This "reporting obligation is essential to accomplishing Title VII's 'primary objective,' which is 'not to provide redress but to avoid harm.'" *Boyer-Liberto*, 786 F.3d at 282 (quoting *Faragher,* 524 U.S. at 806).

Defendant submits Plaintiff failed to take advantage of available preventative opportunities as it is uncontested that Plaintiff waited for more than one-and-one-half years to report McGraw's harassment. Def. Mem. 13. Plaintiff testified that McGraw had sent him sexually explicit text messages and engaged in other inappropriate conduct from the time Plaintiff was an intern and throughout his being a regular employee of Defendant from May 2012 until December 16, 2013, the date of Plaintiff's *first and only* complaint. *Id.*; *see* Pl. Dep. 98–100. In his deposition, Plaintiff stated he had not reported McGraw earlier because he was concerned he did not have sufficient evidence. Pl. Dep. 101–02. However, the court has recognized that the victim is commanded to "report the misconduct, not investigate, gather evidence, and then approach company officials." *See Matvia,* 259 F.3d at 269 (citing *Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 807 (finding employer had established the affirmative defense when employee had waited from September 1997 until December 1997 to report supervisor's ongoing harassment and employer terminated harasser within days of employee's report)). Plaintiff's failure to report McGraw's conduct when it first occurred made Defendant unable to prevent future conduct. No reasonable juror could determine that Plaintiff's extended delay in reporting McGraw was anything but Plaintiff's failing to avail himself of Defendant's preventative measures.

The undersigned is of the opinion that Defendant has established both elements of the *Ellerth/Faragher* affirmative defense. Defendant is entitled to summary judgment as to Plaintiff's sexual harassment claim.

IV.     Spoliation Motion

The undersigned is of the opinion that, should this recommended disposition be adopted as to the harassment claim, Defendant's pending Motion to Dismiss or for other sanctions based on spoliation of evidence, ECF No. 37, (the "Spoliation Motion") becomes moot and should be dismissed. The parties have advised the court of their agreement that, should Defendant's Motion for Summary Judgment be denied as to the harassment claim, further briefing or other actions may become necessary as to the Spoliation Motion. In any event, it is recommended that the Spoliation Motion be dismissed

as moot. Should the harassment claim survive summary judgment, such dismissal should be without prejudice to both parties filing appropriate motions regarding issues raised in the Spoliation Motion.

V.    Conclusion and Recommendation

For the reasons set forth above, the undersigned recommends Defendant's Motion for Summary Judgment, ECF No. 36, be *granted*, and Defendant's Motion to Dismiss or for Sanctions Based on Spoliation of Evidence, ECF No. 37, be *dismissed as moot*. If this Report and Recommendation is adopted in full, this matter will be ended as to all claims and parties.

IT IS SO RECOMMENDED.


February 9, 2017                                    Kaymani D. West
Florence, South Carolina                            United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**